*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* L A YOUNKINS, Minor.

UNPUBLISHED
November 22, 2024
10:35 AM

No. 366159
Wayne Circuit Court
Family Division
LC No. 2021-000032-NA

Before: FEENEY, P.J., and O'BRIEN and WALLACE, JJ.

PER CURIAM.

Respondent-mother appeals as of right from the order terminating her parental rights to the minor child, LAY, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication have not been rectified), and (j) (based on parent's conduct child is likely to be harmed if returned to parent's care).[1] We affirm.

## I. BACKGROUND

Respondent has a long history of untreated mental health issues and mental health-related hospitalizations that have impacted her and her family's life. In December 2020, Child Protective Services (CPS) received a complaint regarding respondent's behavior towards LAY. At that time, LAY and respondent were living at a homeless shelter. According to shelter staff, respondent had been exhibiting "bizarre" and "paranoid" behaviors, such as not wanting staff to look at LAY and accusing staff of poisoning and sexually assaulting LAY, talking about respondent, and going into her room when she was not present. Shelter staff believed respondent was hitting LAY and would place her hand over LAY's mouth to muffle her cries. Respondent also voluntarily terminated her access to state-sponsored financial assistance, Medicaid, and food stamps despite having no means

---

[1] The order also terminated the parental rights of LAY's unidentified father under MCL 712A.19b(3)(a)(*i*) (child has been deserted by an unidentifiable parent) and (a)(*ii*) (parent has deserted the child for 91 or more days). The unidentified father has not appealed, so we will not address the proceedings related to him except where necessary for a full understanding of the case.

to provide for herself. When offered support services by shelter staff, respondent refused to accept their help.

In January 2021, petitioner filed a petition requesting that the trial court take jurisdiction over LAY under MCL 712A.2(b)(1) (parent neglects or refuses to provide proper or necessary support and care) and (2) (home is unfit by reason of neglect, cruelty, drunkenness, criminality, or depravity by the parent), and remove her from respondent's care. The petition alleged that LAY was at risk in respondent's care because respondent's mental health issues impacted her ability to effectively care for LAY, respondent did not have stable income or housing, and LAY tested positive for tetrahydrocannabinol (THC) at birth. The petition indicated that reasonable efforts were made to prevent removal, including offers for support services from CPS and the shelter, and an attempt by CPS to arrange a family team meeting, which respondent declined. Finding that respondent's behavior placed LAY at risk of harm, the trial court entered an ex parte order, removing LAY from respondent's care and placing her with a foster family.

Proceedings were initially delayed because respondent claimed to have Native American ancestry. While the court was awaiting responses from local tribes, it held several pretrial hearings. During the hearings, respondent indicated her relatives were interested in caring for LAY; however, no one ever contacted the caseworkers regarding such a placement. Respondent also repeatedly claimed that LAY was being physically and sexually abused by her foster family, stating that she saw bruises, scratches, and marks on LAY. However, caseworkers and doctors did not observe any marks on LAY's body, and found no evidence that she was being abused. When doctors and caseworkers informed respondent of these findings, respondent would become irate and aggressive, to the point that the caseworkers had to be escorted away by police on a few occasions. Because of respondent's erratic behavior, the court briefly suspended in-person parenting time and respondent's ability to attend LAY's medical appointments. The trial court later reinstated her in-person parenting time, but gave discretion to petitioner to end the in-person visits if respondent exhibited any problematic behavior.

Once the court received notice that respondent did not have any Native American ancestry, it held the adjudication trial. During the trial, respondent detailed her history of mental health issues, including diagnoses of anxiety, major depression, and bipolar disorder, and that she had been voluntarily and involuntarily admitted to psychiatric hospitals. When the petition was filed, respondent was not receiving mental health care or medication; however, she had recently sought mental health treatment with Macomb County Access and was enrolled in their Infant Maternal Health (IMH) services. She was not yet receiving medication because she had not met with a psychiatrist. Respondent reported that she had not had a job since before she gave birth to LAY, but was receiving unemployment benefits. She explained that she had previously suspended her state-sponsored benefits because her phone was being hacked. Respondent stated that she was temporarily living with her boyfriend, but was looking for her own house. Respondent also admitted that she had ingested marijuana while pregnant, but denied using it at present.

A CPS worker also testified, stating that although shelter staffers reported concerns of abuse and erratic behavior by respondent, he did not witness any abuse or notice any marks on LAY that would be consistent with abuse. He conducted several interviews with respondent, during which he learned that respondent "voluntarily turned off her benefits because she said she was moving," despite having no other means to care for LAY. The worker acknowledged that

turning off benefits did not constitute neglect or maltreatment, and that during his visits with LAY he did not have any concerns about her well-being. He also testified that he had not spoken to respondent's mental health providers to determine her psychiatric history, and relied on prior CPS records to identify those mental health issues.

Petitioner claimed the trial court should take jurisdiction over LAY because respondent displayed "several instances of concerning paranoia bordering on delusions." Further, petitioner claimed that respondent had a history of housing, employment, and financial instability, and even briefly suspended her benefits without having any other means for providing for LAY. By contrast, the lawyer-guardian ad-litem (L-GAL) requested the trial court not take jurisdiction over LAY and, instead, order petitioner to provide respondent with services because there was no evidence to prove that LAY was physically abused, neglected, or otherwise harmed while in respondent's care. Although respondent reported having mental health issues, the L-GAL noted that petitioner did not provide any concrete evidence of a mental health diagnosis and it failed to provide respondent with any mental health services. Respondent agreed, claiming that because she had sought out mental health services of her own volition, exhibited appropriate behavior during in-person visits, and was pursuing more stable housing and employment opportunities, the trial court should only order her to participate in supportive services. The trial court found there was sufficient evidence to take jurisdiction over LAY based on respondent's mental health issues, housing and income instability, and drug use.

In September 2021, the trial court held the first dispositional review and permanency planning hearing. The caseworker stated that respondent had been doing well during visits with LAY, but she missed 15 visits between June 2021 and September 2021, and was often late. The worker reported that respondent had texted her several times accusing LAY's foster family of physically and sexually abusing LAY, but there was no evidence to support these claims. Respondent also testified, claiming that LAY had "marks on her that people haven't acknowledged in a timely manner," and her "speech has gone down." She further alleged that she had a recording of her "walking up on the Foster parent and my daughter saying, 'Stop, don't do that.' While she was just changing a diaper." Respondent claimed this was a sign that LAY's foster parents were abusing her. Based on the testimony, the trial court found respondent had been making progress on her service plan and that reasonable efforts towards reunification should continue. The court ordered respondent to participate in a psychiatric evaluation, individual therapy, IMH services, parenting classes, and supervised visitation.

Over the next few months, the trial court held several more dispositional review and permanency planning hearings. During the hearings, caseworkers detailed respondent's resistance to her service plan. For example, despite being referred for a psychiatric evaluation, respondent failed to complete it. When respondent arrived for the evaluation, she was "very argumentative, very combative, very agitated, very irritated," and refused to sit for the entire appointment. Respondent also was not participating in therapy or IMH services even though multiple referrals had been made, had not provided proof of housing or income, and was not consistently attending parenting time—having missed almost half of the scheduled visits. Respondent also continued to make bizarre statements and claims, some of which disrupted the court proceedings, suggesting her mental health was still an issue.

In October 2022, petitioner filed an amended petition to terminate respondent's parental rights under MCL 712A.19b(3)(a)(*i*), (a)(*ii*) (abandonment), (c)(*i*), (c)(*ii*) (parent received recommendation to rectify conditions that caused child to come within court's jurisdiction, and conditions have not been rectified after reasonable opportunity to do so), (g) (parent although able to do so fails to provide proper care or custody), (i) (parental rights to child's sibling have been terminated), and (j) (reasonable likelihood that the child would be harmed if returned to the parent). The petition alleged that respondent failed to complete or benefit from her court-ordered services, including parenting classes, IMH services, individual therapy, substance abuse treatment, and a psychiatric evaluation. Respondent also failed to maintain suitable housing or a legal source of income. Respondent missed 72 out of 152 scheduled visits between February 2021 and September 2022, and was late to numerous visits during that time. In fact, with the exception of one visit in September 2022, the October 2022 petition alleged that respondent had not visited with LAY since April 2022. The petition also noted that respondent gave birth to a second, unnamed child in June 2022, whom she tried to surrender. However, after receiving a psychological evaluation, it was determined that respondent "was not coherent enough to make that decision. [Respondent] refused to answer any of CPS's questions, to name the baby, or to visit with him."

The trial court held the termination hearing in March 2023. The caseworker explained that in the two years since respondent had been given a treatment plan, the only service that respondent completed was a psychological examination despite being given multiple referrals for different services. While respondent had previously been attending therapy, she stopped attending therapy and all other services in February of 2022 – more than a year before the hearing. She made IMH referrals, but respondent "never followed up to actually start those services." Respondent had not provided any proof of income or verified or offered her home for assessment. The caseworker also testified that respondent had been inconsistent with her communication and visitation, and had only visited with LAY twice in the preceding four months (those visits occurred on December 1, 2022 and October 6, 2022).[2] During the few visits that respondent did attend, she would claim there were bruises and scratches on LAY's body, however, there were no observable marks. Respondent also made concerning comments during visits. For example, respondent claimed "she could read [LAY's] mind and that they were ta[l]king telepathically," and that LAY "told her that she was being abused when [LAY] was not talking at that point." The caseworker testified that, during the few times she was able to discuss the issue of mental health with respondent on the telephone, respondent denied having any mental health obstacles and would send her multiple text messages with photographs that respondent claimed to depict LAY being abused. However, the caseworker was able to ascertain that the photographs did not even depict LAY – they were actually stock photographs that were available online via a Google Images search. The worker acknowledged that there was a bond between LAY and respondent during visits, but respondent had to initiate physical contact with LAY. By contrast, LAY had a strong bond with her foster family, her foster family met all of her needs, and they were willing to provide long-term care.

---

[2] The caseworker testified that she had a post office box for respondent in Mount Clemens, but every time she would text respondent or try to call her, regarding the issue of where respondent was sleeping at night, respondent would not answer.

During the hearing, the caseworker also provided testimony about transportation challenges that could have affected getting to and from visitation and other required appointments. She said the agency previously provided respondent with bus passes, would drive her to or from visits, and would order rides via Lyft. However, around the time of respondent's last visitation in December of 2022, respondent informed the caseworker that she had acquired a car. When asked how she was using the car, respondent would not answer. The caseworker said she intended to provide respondent with a gas card around December 8, 2022, but respondent never again returned for a visit, so the caseworker still had the unused gas card.

Based on this testimony, petitioner and the L-GAL requested that the trial court find statutory grounds existed for termination and that termination was in LAY's best interests because respondent failed to complete her court-ordered services and had not rectified the conditions that brought LAY into care. By contrast, respondent argued that termination would be improper because the service plan did not adequately address her mental health issues or provide her with specialized mental health services. The trial court terminated respondent's parental rights, under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), and (j), finding termination was in LAY's best interests because respondent did not complete her court-ordered services, her mental health struggles posed a risk to LAY, respondent had not visited with LAY in months, and LAY had a bond with her foster family who was able to adequately meet her needs. This appeal followed.

Respondent argues that the trial court erred by finding termination was in LAY's best interests because the court did not provide respondent with sufficient resources to address her mental health needs and did not adequately assess the best interest factors.[3] We disagree.

## II. STANDARD OF REVIEW

The issue whether petitioner established that termination of respondent's parental rights was in the best interests of LAY is preserved for appellate review. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227-228; 964 NW2d 809 (2020); see also *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). But respondent's arguments on appeal largely center on

---

[3] We note that respondent also argues that the trial court erred because relative placement with the family of DAB, who respondent erroneously refers to as the legal father of LAY, should have been explored. However, there has been no finding in this matter that DAB is the father of LAY, and there is nothing in the record suggesting that DAB is the father of LAY. Rather, DAB provided testimony at the March 2023 hearing pertaining to his son, an unnamed baby who he fathered with respondent in 2022 (the unnamed baby was the subject of a companion case heard by the court with this case involving LAY). In other words, his testimony did not pertain to LAY, it pertained to the issue of the respective parental rights of he and respondent as it concerned the unnamed baby. At that hearing, the court terminated the parental rights of the putative father of LAY (the identity of the father remains unknown), terminated respondent's parental rights as they pertained to LAY, and also made rulings on the parental rights of DAB and respondent as they pertained to the unnamed baby. Finally, throughout the proceedings pertaining to LAY, caseworkers and the court addressed the option of a relative placement, but no one ever contacted the caseworkers to establish a relative placement. Thus, there was no error in this regard.

whether she was offered adequate services to address her mental health. To timely preserve a challenge premised on the adequacy of the services provided by petitioner, respondent had to object to the case service plan or assert that the plan was inadequate either when the court adopted the case service plan or during a subsequent hearing to update the case service plan. See *In re Atchley*, 341 Mich App 332, 336-338; 990 NW2d 685 (2022). Because respondent did not object to the service plan until the termination hearing, any argument regarding the adequacy of the service plan is unpreserved. See *id*.

We review the trial court's best-interest findings for clear error. *In re Sanborn*, 337 Mich App 252, 258, 276; 976 NW2d 44 (2021). "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012) (quotation marks, alteration, and citation omitted). However, unpreserved issues are reviewed for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). A plain error affecting substantial rights is an error that is "clear or obvious" and that affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

III. ANALYSIS

Respondent argues that the trial court erred because it did not adequately assess the best-interest factors and it was not in LAY's best interests to terminate her parental rights.

"Even if the trial court finds that [DHHS] has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015). The focus of the best-interest determination is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014). Factors to consider include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). Other relevant considerations are "the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714.

LAY was brought under the jurisdiction of the court because of respondent's mental health issues. To address these issues, the court ordered respondent to participate in a psychiatric evaluation, individual therapy, IMH services, and parenting classes. However, in the nearly two years since respondent had been given a treatment plan, the only service that she completed was a psychological examination despite being given multiple other referrals and several appointments to complete her psychiatric evaluation. Respondent provided no proof of income, failed to offer her home for assessment, and she was inconsistent with her communication and visitation—only visiting with LAY twice in the four months leading up to termination. During the few visits that respondent did attend, she would claim there were bruises and scratches on LAY's body. But

-6-

when caseworkers observed LAY, they did not see any marks. Respondent also made concerning comments during visits, claiming that she could telepathically communicate with LAY and that LAY told her she was being abused even though LAY was unable to speak at that time. Although there was evidence of a bond between LAY and respondent, the caseworker noted that respondent had to initiate physical contact with LAY. By contrast, LAY had a strong bond with her foster family, her foster family met all of her needs, and they were willing to provide long-term care.

In the order terminating respondent's parental rights, the trial court explicitly found that termination was in LAY's best interests because of respondent's on-going mental health issues, housing and income instability, noncompliance with her service plan, and failure to visit with the child since December 2022. Further, the court found that LAY was bonded to her foster family and that they were willing to adopt her. Because the record supports the trial court's determination that termination was in LAY's best interests, the trial court did not clearly err in reaching that conclusion. See *In re Olive/Metts*, 297 Mich App at 41. As established above, all of those facts— the foster family's willingness to adopt LAY, respondent's failure to participate in and benefit from her service plan, her repeated refusal to attend visits with LAY, respondent's lack of housing and income, and the significant concern about harm to LAY from respondent's unresolved mental health issues—support the finding that termination of respondent's parental rights was in LAY's best interests. See *In re White*, 303 Mich App at 713-714; *In re Olive/Metts*, 297 Mich App at 41-42.

Respondent also argues that because the trial court did not provide her with more intensive mental health services the court necessarily erred by terminating her parental rights. As noted, respondent objected to the service plan for the first time at termination—about two years later after receiving the plan; thus, there was no opportunity for the trial court to order additional services or make any accommodations. But even if she had timely challenged her services, respondent must still "establish that she would have fared better if other services had been offered." *In re Sanborn*, 337 Mich App at 266. Throughout the proceedings, respondent often refused to participate in court-ordered services, including not attending therapy for more than a year prior to the hearing, and failed to complete any of her court-ordered services. She also stopped visiting with LAY, and the caseworkers were unable to get in contact with her. Importantly, respondent had "a commensurate responsibility . . . to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Given respondent's outright refusal to cooperate with almost any aspect of her treatment plan, respondent has not demonstrated that she would have fared better if other services had been offered. As such, there is no clear or plain error.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Colleen A. O'Brien
/s/ Randy J. Wallace